IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:25-cv-00662-CNS-TPO

ZAYO GROUP, LLC,

      Plaintiff,

v.

HARVEY SENDER, as Trustee on behalf of Debtor iBridge Cloud Solutions, Inc.,
IBRIDGE CLOUD TECHOLOGIES, INC.,
IBRIDGE TECHOLOGY SOLUTIONS, INC.,
GOLD TAILINGS INVESTMENTS, LLC,
DATA CENTER FACILITIES MANAGEMENT, INC., and
PAUL SMITHAM,

      Defendants.

---

## ORDER

---

This case arises from contracts entered into by Plaintiff Zayo Group, LLC (Zayo) and iBridge Cloud Solutions, Inc. (ICS), in which ICS purchased access to and utilization of portions of Zayo's fiber network and associated infrastructure and related telecommunications and infrastructure services. Two contracts primarily govern the parties' relationship: the Master Customer Agreement (MCA), ECF No. 22-2, into which the parties entered first, followed by the I-Bridge Payment Restructure Agreement (Restructure Agreement), ECF Nos. 22-4, 84-1. The parties put forth contradictory allegations regarding the circumstances that necessitated entering into the Restructure

Agreement, but, in essence, each contends that they were forced to reevaluate their contractual relationship after the other side failed to live up to their obligations.

At bottom, Plaintiff alleges that despite providing ICS with the contracted-for services, ICS refused to pay Plaintiff over $11 million in costs owed. After Plaintiff filed this suit to recover unpaid costs, ICS filed for Chapter 7 bankruptcy and now proceeds through its bankruptcy trustee, Defendant Harvey Sender. Plaintiff subsequently filed an amended complaint seeking to recover both from ICS and from the remaining defendants as ICS's alter egos. The bankruptcy-imposed stay notwithstanding, Plaintiff and ICS agreed to fully adjudicate their claims in federal court in this matter. Additionally, after entering into the stipulation, the Trustee filed a series of counterclaims alleging, among other things, that Plaintiff failed to provide ICS the numerous contracted-for services under the parties' agreements, resulting in significant network interruptions for ICS's clients.

Currently before the Court are three motions to dismiss: (1) Motion to Dismiss Plaintiff's Third Claim for Relief (Alter Ego Liability) Pursuant to Rule 12(b)(1), filed by Harvey Sender, in his capacity as Chapter 7 Trustee for the bankruptcy estate of Defendant iBridge Cloud Solutions, Inc. (the Trustee), ECF No. 55; (2) the Non-Debtor Defendants' Motion to Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P 12(b)(2), filed by Defendants iBridge Cloud Technologies, Inc. (ICT); iBridge Technology Solutions, Inc. (ITS); Gold Tailings Investments, LLC (Gold Tailings); Data Center Facilities Management, Inc. (DCFM), and Paul Smitham (together, the Non-Debtor Defendants), ECF No. 56; and (3) Plaintiff/Counterclaim Defendant Zayo Group, LLC's

Motion to Dismiss Amended Counterclaims Pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure, ECF No. 64.

The Court addresses each motion and, for the reasons explained below, hereby
ORDERS that: (1) The Trustee's motion to dismiss Plaintiff's third claim for relief, ECF
No. 55, is GRANTED; however, Plaintiff may still pursue alter ego liability as an equitable
remedy for its remaining claims for breach of contract and moneys owed on an open
account. (2) The Non-Debtor Defendants' motion to dismiss for lack of personal
jurisdiction, ECF No. 56, is DENIED. (3) Plaintiff's motion to dismiss the Trustee's
counterclaims is GRANTED in part and DENIED in part. In reaching its conclusions, the
Court presumes the reader's familiarity with this case's background. *See, e.g., Clinton v.
Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1274–75 (10th Cir. 2023).

## I.     BACKGROUND[1]

### A.     Sources for Factual Allegations

The factual allegations referenced in this order are taken from Plaintiff's First
Amended Complaint, ECF No. 22; the Trustee's allegations pled in connection with its
counterclaims, ECF No. 54 at 31–67; and in some instances, documents attached to the
First Amended Complaint or submitted in connection with the dismissal motions, as the
Court is permitted to do when evaluating a motion to dismiss.[2] *See Equal Emp.*

---

[1] Citations to docket entries refer to the page number in the ECF header and not the internal pagination.

[2] Other documents submitted by the parties include a deck and memorandum attached in connection with the Trustee's counterclaims, ECF Nos. 54-1, 54-2; excerpts from the deposition of Paul Smitham in the related bankruptcy action, attached by Plaintiff, ECF Nos. 22-1,71-1; and a "Wavelengths Product Overview" attached to the Trustee's response brief, ECF No. 84-3. These documents, which are not incorporated into the pleadings, are a bridge too far for the Court to consider at this time, lest it be required to convert any of the dismissal motions into motions for summary judgment. *See, e.g., Jackson v. Integra Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991).

*Opportunity Comm'n v. 'Murica, LLC*, 694 F. Supp. 3d 1356, 1365 (D. Colo. 2023) (When ruling on a dismissal motion, "the Court may consider documents incorporated by reference, documents referred to in the complaint that are central to the claims, and matters of which a court may take judicial notice," including "[p]ublicly filed court records" without converting it to summary judgment motion.) (internal citations omitted). Specifically, the Court finds that because the documents are referred to in the pleadings and central to Plaintiff's claims and the Trustee's counterclaims, it may properly take judicial notice of the Master Customer Agreement (MCA), ECF No. 22-2; the Customer Orders between Plaintiff and Defendant ICS, ECF Nos. 22-3, 84-1 at 7–10, 84-2, 84-4; and the I-Bridge Payment Restructure Agreement (Restructure Agreement), ECF Nos. 22-4, 84-1 at 1–6.

The Court may also properly take judicial notice of the parties' Stipulation for Relief from the Automatic Stay and Related Relief entered into by Plaintiff and the Trustee in the related bankruptcy action, *see In re iBridge Cloud Solutions, Inc.*, No. 24-11105-KHT, ECF No. 27 (the Bankruptcy Stipulation), which is related to the instant matter and is publicly available on the docket for ICS's bankruptcy action. *See also Hodgson v. Farmington City*, 675 F. App'x 838, 841 (10th Cir. 2017) (documents subject to judicial notice include "another court's publicly filed records 'concerning matters that bear directly upon the disposition of the case at hand'") (quoting *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007)). Finally, because the Non-Debtor Defendants move to dismiss Plaintiff's complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the Court may consider "consider affidavits and other written

materials submitted by the parties" in connection with its review.[3] *See Zebrasky v. Montgomery Mut. Ins. Co.*, 689 F. Supp. 3d 968, 970 (D. Colo. 2023) (citation omitted).

### B.    Procedural Background

On February 29, 2024, Plaintiff filed a complaint against the Trustee in Denver County District Court (the State Court Action). *See* Bankruptcy Stip. ¶ 1. Two weeks later, the Trustee filed for Chapter 7 bankruptcy (the Bankruptcy Action). *See id.* ¶ 2; *In re iBridge Cloud Solutions, Inc.*, No. 24-11105-KHT. Approximately one year later, the Trustee removed the State Court Action, ECF No. 1, and this case was assigned to the undersigned, ECF No. 32. Once removed, Plaintiff filed its First Amended Complaint, adding the Non-Debtor Defendants as parties based on a theory of alter ego liability. ECF No. 22. The Trustee subsequently filed its Answer and Amended Counterclaims against Plaintiff. ECF No. 54.

## II.    ANALYSIS

### A.    Choice of Law for Alter Ego Liability Analysis

As an initial matter, the Court notes that Plaintiff's allegations that the Non-Debtor Defendants were ICS's alter egos, *see* ECF No. 22 ¶¶ 9–75, 93–114, are relevant to each Defendants' dismissal motion and require determining which state's law should apply in assessing the sufficiency of those claims. In connection with the Trustee's motion to dismiss Plaintiff's third, standalone claim for alter ego liability, both Plaintiff and the Trustee apply Nevada law. *See* ECF No. 55 at 6 ("Nevada law . . . governs the alter ego

---

[3] In connection with the Rule 12(b)(2) dismissal motion, Non-Debtor Defendants submitted declarations from Mr. Paul Smitham, ECF No. 56-1, and Mr. Allen H. McKibben, ECF No. 56-2, and Plaintiff submitted a declaration from Ms. Cathryn Vickers, ECF No. 71-2.

analysis . . ."); ECF No. 70 at 6 (describing the requirements for a bankruptcy estate to own a claim under Nevada law). In a separate dismissal motion for lack of personal jurisdiction, the Non-Debtor Defendants contend that Colorado law applies. *See generally* ECF No. 56 (apply Colorado law to alter ego analysis); *see also* ECF No. 85 at 4–5 (arguing that "Colorado law controls"). However, even though the choice of law question is relevant to each motion, the purpose of each analysis differs and, somewhat unintuitively, leads to two different results. This is because, as explained further below, the Trustee's motion turns on the question of claim *ownership* (i.e., whether Claim III, the alter ego cause of action, properly belongs to Plaintiff or the bankruptcy Trustee) as opposed to whether, as a more substantive matter, Plaintiff sufficiently pled its alter ego claim for purposes of exercising personal jurisdiction over the Non-Debtor Defendants.

The Court conducts its choice of law analyses for Plaintiff's alter ego-related claims below before turning to the substance of each motion.

1.  *Choice of Law Principles Applied to the Trustee's Dismissal Motion*

Turning first to the Trustee's motion for lack of subject matter jurisdiction, the Trustee argues that Plaintiff lacks standing to pursue its Claim III for alter ego liability because that claim belongs solely to ICS's bankruptcy Trustee. ECF No. 55 at 4–8. "Property interests are created and defined by state law," and "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54 (1979). Thus, "[s]tate law provides the guidelines for determining whether a cause of action belongs to the debtor and therefore becomes property of the [bankruptcy] estate." *Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir.

pg 7 of 52

1996); *see also Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 496 (Nev. 1998) ("While the bankruptcy court has jurisdiction over the debtor's estate, which includes all legal and equitable interests in property, state law defines what those interests are." (citing *Wilson v. Bill Barry Enterprises, Inc.,* 822 F.2d 859, 861 (9th Cir.1987)); *In re Signia, Ltd.*, No. AP 24-1214 TBM, 2025 WL 1409225, at *13 (Bankr. D. Colo. May 14, 2025) ("[W]ith respect to analysis of alter ego claims, the federal courts (at all levels) have uniformly held that state law must be analyzed to determine whether alter ego claims are property of the bankruptcy estate under Section 541(a)." (collecting cases)).

Here, Plaintiff alleges, and the Trustee admits, that ICS is incorporated under Nevada law. *See* ECF No. 22 ¶ 2; ECF No. 54 at 2. And, at least for purposes of the Trustee's dismissal motion and as noted above, both Plaintiff and the Trustee agree that Nevada law applies. *See* ECF No. 55 at 6; ECF No. 70 at 6. The Court agrees that it is proper to look to the law of the state in which ICS is incorporated in this instance and thus applies Nevada law below in connection with its analysis of whether the standalone alter ego liability claim belongs to the Trustee such that Plaintiff lacks standing to bring it. *See Butner*, 440 U.S. at 55 ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *see also, e.g.*, *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1250 (9th Cir. 2010) (applying California law to determine whether an alter ego claim belonged to a creditor or the trustee of a bankrupt corporation where "[t]he parties agree[d] that California law applies because [the bankrupt corporation] is a California corporation").

2. *Choice of Law Principles Applied to the Non-Debtor Defendants'
Dismissal Motion*

The choice of law question in connection with the Non-Debtor Defendants'

dismissal motion is not as easily answered. In their motion, the Non-Debtor Defendants

apply Colorado law, *see generally* ECF No. 56, and argue in their reply that Colorado law

should apply to determine whether Plaintiff's alter ego allegations are sufficient to support

personal jurisdiction over the Non-Debtor Defendants. ECF No. 85 at 4–5. The Non-

Debtor Defendants identify three cases in support of their position, but fail to articulate

how those authorities support their position or are analogous to the facts here. *See* ECF

No. 85 at 4–5 (citing *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132

(10th Cir. 1991); *Matthys v. Narconon Fresh Start*, 104 F.Supp.3d 1191, 1198, 1202-03

(D. Colo. 2015); *TransFirst, LLC v. Brown*, 323 F.R.D. 641, 647, 653-54 (D. Colo. 2018)).

The Non-Debtor Defendants also neglect to identify any test or standard to apply when

determining which state's alter ego law governs the analysis. In its opposition to the

dismissal motion, Plaintiff again assumes that Nevada law applies, *see* ECF No. 71, but

fails to provide any analysis or explain how it reached that conclusion. Left without

guidance from the parties on this question, the Court has conducted its own research,

outlined below, to determine which state's law applies.

In Colorado, "personal jurisdiction may be exercised on a theory of alter ego," but

doing so requires the Court to first "consider whether to pierce the corporate veil."

*TransFirst*, 323 F.R.D. at 653 (citing *Griffith v. SSC Pueblo Belmont Operating Co. LLC*,

381 P.3d 308, 312 (Colo. 2016)). This requires the Court to make a threshold

determination as to which state's alter ego law applies to corporate veil piercing. *See*

*Titan Feeding, LLC v. Corey Cattle Co., LLC*, No. 19-cv-02541-PAB-SKC, 2023 WL
2743277, at *3 (D. Colo. Mar. 31, 2023). As a federal court sitting in diversity jurisdiction
in Colorado, "Colorado choice of law principles [] determine which state law governs the
alter ego analysis." *Id.* "Although no Colorado Supreme Court or Colorado Court of
Appeals decision has addressed . . . what state's law should be used to conduct an alter
ego analysis for an out-of-state [entity], Colorado courts apply the 'most significant
relationship' test to determine choice of law questions" where, as here, Plaintiff relies on
an alter ego theory of liability for its contract claims. *Id.* (collecting cases). The most
significant relationship test requires considering: "(a) the needs of the interstate and
international systems, (b) the relevant policies of the forum, (c) the relevant policies of
other interested states and the relative interests of those states in the determination of
the particular issue, (d) the protection of justified expectations, (e) the basic policies
underlying the particular field of law, (f) certainty, predictability and uniformity of result,
and (g) ease in the determination and application of the law to be applied." *See id.* (citing
*AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 510 n.2 (Colo. 2007)).

In a contract dispute, courts must consider: "(a) the place of contracting, (b) the
place of negotiation of the contract, (c) the place of performance, (d) the location of the
subject matter of the contract, and (e) the domicile, residence, nationality, place of
incorporation and place of business of the parties." *Id.* at *4 (citing *Wood Bros. Homes,
Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372, n.4. (Colo. 1979)). As part of its
analysis, the Court may consider statements proffered in affidavits submitted by the
parties in connection with the Non-Debtor Defendants' 12(b)(2) dismissal motion. As to

the first factor, the declaration submitted by Plaintiff states that the relevant contracts were at least partially negotiated in Colorado. *See* ECF No. 71-2 (Vickers Decl.) ¶ 7. Neither party's declarations specify the place of performance or location of the subject matter of the contract, but the customer orders submitted by ICS to Plaintiff establish that the place of performance for multiple projects under the contracts were various locations in California. *See, e.g.*, ECF No. 22-3 at 2 (identifying "Santa Clara, CA" as the order location); *id.* at 5, 9 (identifying "Sacramento, CA" as the order location); *id.* at 7 (identifying "San Francisco[,] CA" as the order location); *id.* at 9 (identifying "Rancho Cordova, CA" as the order location). The Restructure Agreement also references the establishment of a "long-term business relationship to expand [ICS's] service offering in [] California." ECF No. 22-4 at 2.

Finally, according to the parties' declarations and Plaintiff's allegations (to the extent they are not contrary to statements in the declarations), the parties' places of incorporation and places of business are as follows:

- Plaintiff Zayo is a Colorado corporation operating out of Colorado, ECF No. 22 ¶ (Compl.) 1;

- Defendant ICS is a Nevada corporation, *id.* ¶ 2;[4]

- Defendant ICT is a Delaware corporation with its principal place of business in Rancho Cordova, California, ECF No. 56-1 (Smitham Decl.) ¶ 8;

- Defendant ITS is a Delaware corporation with its principal place of business in Rancho Cordova, California, *id.* ¶ 13;

- Defendant Gold Tailings is a California limited liability company with its principal place of business in Rancho Cordova, California, *id.* ¶ 18; and

---

[4] The Trustee's answer to this allegation admits this fact. *See* ECF No. 54 at 2.

- Defendant DCFM is a California corporation with its principal place of business in Rancho Cordova, California, ECF No. 56-2 (McKibben Decl.) ¶ 2.

Additionally, individual Defendant Smitham's sworn declaration states that he resides and works in Rancho Cardova, California, ECF No. 56-1 ¶ 1, has "never maintained a place of business [in] Colorado," *id.* ¶ 2, and has "never travelled to Colorado to conduct business there," *id.* ¶ 4. Taking these factors together, it is clear that, despite Plaintiff's decision to proceed with briefing this issue under Nevada law, the state with the most significant relationship to the contracts underlying Plaintiff's claims is either Colorado or California—and not Nevada. However, neither party suggests that California law should be applied to Plaintiff's alter ego contract claim. Moreover, the contracts under which the Non-Debtor Defendants may be liable (if Plaintiff establishes that the Non-Debtor Defendants are ICS's alter egos) each contain a Colorado choice-of-law and forum selection provision. *See* ECF No. 22-2 (MCA) § 5.4 ("The [MCA] shall be governed by and construed in accordance with the laws of Colorado . . . Venue for any dispute arising under the Agreement shall be Denver, Colorado."); ECF No. 84-1 (Restructure Agreement) § 3.8 ("All claims arising out of or relating to [the Restructure] Agreement will be governed by Colorado law . . . and will be litigated exclusively in the federal or state courts of Denver, Colorado. The Parties consent to personal jurisdiction in those courts."). This further supports the Court's conclusion that Colorado is the state with the most significant relationship to the contracts at issue. *See Lumen Techs. Serv. Grp., LLC v. CEC Grp., LLC*, No. 23-cv-00253-NYW-KAS, 2025 WL 3676988, at *3 (D. Colo. Dec. 18, 2025) ("Colorado courts have instructed that '[c]hoice of law provisions are ordinarily

given effect as they are considered a clear manifestation of the parties' intentions.'" (citing *Mountain States Adjustment v. Cooke*, 412 P.3d 819, 822 (Colo. App. 2016)).

Thus, consistent with the above, the Court applies Colorado law below to assess Plaintiff's attempt to hold the Non-Debtor Defendants liable for ICS's contractual obligations as ICS's alleged alter egos.

### B. Trustee's Motion to Dismiss Plaintiff's Third Claim For Alter Ego Liability For Lack of Subject Matter Jurisdiction (ECF No. 55)

The Trustee moves to dismiss Plaintiff's third claim for alter ego liability for lack of subject matter jurisdiction under Rule 12(b)(1), arguing that Plaintiff does not have Article III standing. ECF No. 55 at 4–8. Specifically, the Trustee contends that under 11 U.S.C. § 541(a)(1) of United States bankruptcy code and Nevada law, only the bankruptcy Trustee possesses the right and standing to pursue general claims intended to recover property of the estate, including Plaintiff's general alter ego claim. *Id.* at 3. In response, Plaintiff contends that its claim is not generally applicable to all creditors but is an individual claim specific to Plaintiff because "the Non-Debtor Defendants are [] liable for *breaching* the MCA and Restructure Agreement because they were the alter egos of ICS." ECF No. 70 at 9 (emphasis in original). Plaintiff argues that because its "contractual alter ego claim arises from an injury that is particular and personal to Zayo and no other creditor," *id.* at 10, Plaintiff, rather than the Trustee, has standing to bring it.

Upon review of the case law and the parties' briefing, and as explained below, the Court believes that, to a certain extent, both parties are correct. Thus, even though the Trustee's motion to dismiss Plaintiff's third claim is granted, the Non-Debtor Defendants *are not dismissed* from this action, as Plaintiff may still proceed on a theory of alter ego

liability with respect to its remaining claims for breach of contract and moneys owed on an open account.

1.  *Rule 12(b)(1) Legal Standard*

"To satisfy Article III's case-or-controversy requirement, a plaintiff must demonstrate standing to sue by establishing "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016) (citation omitted). Under Rule 12(b)(1), dismissal for lack of subject matter jurisdiction is proper if a court determines that it lacks authority to adjudicate the matter. *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994). This may occur either because a party fails to meet the jurisdictional requirements or because Congress has denied standing by statute. *See, e.g., Willess v. United States*, 560 F. App'x 762, 764 (10th Cir. 2014) (dismissing appellant's medical malpractice claim for lack of standing due to the creation of a bankruptcy estate under Section 541).

Where the court relies "only on the allegations in Plaintiffs' complaint[,] . . .  [it] construe[s] Defendants' Rule 12(b)(1) motion as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Knellinger v. Young*, 134 F.4th 1034, 1042 (10th Cir. 2025) (citing *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997)). Plaintiff bears the burden of establishing jurisdiction on a claim-by-claim basis. *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").

2.  *Claims Owned by a Bankruptcy Trustee*

The commencement of a bankruptcy action creates an estate, and a bankruptcy trustee is then required to marshal all of the estate's property for the estate's benefit. *See* 11 U.S.C. §§ 541(a), 704. A bankruptcy estate's property encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case," *id.* § 541(a)(1), including causes of action, *see* H.R. Rep. 95–595, 95th Cong., 1st Sess. 367–68 (1977); S. Rep. 95–989, 95th Cong., 2d Sess. 82–83 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5963, 6323, 5787, 5868; *see also In re AgriBioTech, Inc.*, 319 B.R. 216, 219 n.2 (D. Nev. 2004).

Here, "the central issue is whether under Nevada state law the [Trustee] could have brought the asserted claim[] . . . or whether the causes of action belong to individual creditors. To make this determination, the Court must examine [the pleadings] and evaluate whether the claims the Trustee actually asserts against [the Non-Debtor Defendants] belong to the estate or to [Plaintiff]." *In re AgriBioTech, Inc.*, 319 B.R. at 222. Whether an alter ego claim belongs to a bankruptcy trustee or a creditor depends on whether the claim is "general," and equally applicable to all creditors, or "personal," and intended to address harm specific to an individual creditor. *See Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348–49 (7th Cir. 1987). To assert an individualized claim for alter ego liability, Plaintiff must show some "unique or personal harm." *In re Icarus Holding, LLC*, 391 F.3d 1315, 1321 (11th Cir. 2004), *certified question answered sub nom. Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 612 S.E.2d 296 (2005). "[I]f the injury alleged in the alter ego action is an injury to the corporation and

thus suffered generally by all creditors, and is not an injury inflicted directly on any one creditor, the trustee has exclusive standing to bring such an alter ego action." *In re Xenerga*, 449 B.R. 594, 598–99 (Bankr. M.D. Fla. 2011) (citations omitted).

### 3.  *Plaintiff's Third Claim for Alter Ego Liability*

In its complaint, Plaintiff puts forth numerous allegations to establish that the Non-Debtor Defendants were ICS's alter egos. For instance, Plaintiff alleges that ICS and the Non-Debtor Defendants comingled funds, ECF No. 22 ¶ 28–44; shared the same primary business location, *id.* ¶¶ 72–75; entered into and back dated inter-company contracts wherein Defendant Smitham signed on behalf of all parties, *id.* ¶¶ 45–48; made inter-company loans without any documentation or expectation that interest would be paid and where Defendant Smitham and his daughter were the only individuals involved, *id.* ¶¶ 49–53; and generally operated as a single business enterprise, including by, *e.g.*, utilizing the same email domain when communicating or sending invoices on behalf of ICS, *id.* ¶¶ 54–68. Plaintiff also alleges that ICS was undercapitalized. *Id.* ¶¶ 69–71.

Even if these allegations would tend to support a general alter ego claim under Nevada law,[5] they do not establish that Plaintiff has a *personal*, standalone alter ego claim against the Non-Debtor Defendants. The complaint does not allege that Plaintiff personally suffered a "particularized injury arising from" the Non-Debtor Defendants' alter ego status; rather, it raises allegations that "could be brought by any creditor of the debtor." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)

---

[5] As discussed above, Nevada law governs the ownership of Plaintiff's third claim for alter ego liability, and so the Court applies it in connection with its analysis here.

(citations omitted); *cf. In re Icarus Holding, LLC*, 391 F.3d at 1321 ("An alter ego claim is

[] 'general' if it is alleged that only the individual creditor bringing the claim was 'harmed

and no other . . . creditor has an interest in the cause.'" (citing *Koch,* 831 F.2d at 1348)).

Absent a "*direct injury traceable to [the alleged alter ego defendant]*, [a creditor] does not

have standing to assert those claims outside of the bankruptcy proceeding." *Id.* (emphasis

added).

 Where, as here, a creditor raises only generalized allegations and does not allege

any individualized harm, "the trustee [is] the proper person to assert claims . . . against

the debtor's alter ego," and not an individual creditor, because the Non-Debtor

Defendants' control and co-mingling impacted ICS's overall financial condition and thus

impacted Plaintiff and all other creditors equally. *Id.*; *see also In re Icarus Holding*, 391

F.3d at 1321 (determining that "[a]n alter ego action . . . could be brought by all creditors"

and thus belonged to the trustee where the creditor alleged "blurred . . . line[s] between

[the debtor] and the [corporate officer] by taking assets of the [debtor] corporation and

using them to his own personal ends" and had "shown no unique or personal harm").

Moreover, Plaintiff's third claim for alter ego liability, if proven, would bring a third-party's

property into the debtor's estate and ultimately "benefit all creditors." *Id.; see also In re

Landmark Fence Co. Inc.*, 424 B.R. 461, 464 (Bankr. C.D. Cal. 2010), *aff'd sub nom. In

re Landmark Fence Co., Inc.*, No. ED CV 10-00143-AHM, 2010 WL 4924739 (C.D. Cal.

Dec. 3, 2010) ("[The debtor's Principal's] exclusive control of the corporation severely

impacted the financial condition of the corporation as a whole and resulted in general

damages to all creditors."). Accordingly, consistent with the foregoing, Plaintiff's third claim for general alter ego liability is dismissed.

### 4. *The Invocation of Alter Ego Liability in Plaintiff's Remaining Claims*

Although Plaintiff's third claim is dismissed, that does not preclude Plaintiff from recovering from the Non-Debtor Defendants. The Trustee only moved to dismiss the *standalone* alter ego liability claim, even though Plaintiff invokes alter ego liability as a remedy for its other two claims, for breach of contract and moneys owed on an open account. *See* ECF No. 22 at ¶¶ 93–105.

Thus, for avoidance of doubt, the Court clarifies that Plaintiff may invoke alter ego liability as an equitable remedy to recover for its remaining claims for breach of contract and moneys owed on an open account, which arise from the parties' contractual agreements and are individualized and unique such that they can be brought by Plaintiff alone. *See, e.g.*, *In re Rich Glob. LLC*, No. 16-cv-00217-ABJ, 2018 WL 11536382, at *5 (D. Wyo. Nov. 27, 2018) (citation omitted) (where the "[creditor] was the party principally injured because Debtor owed it millions of dollars yet never paid it[,] Trustee cannot obtain standing by simply asserting" the creditor's claim). Such use of alter ego liability is permissible under Nevada law, which has "long recognized the *equitable remedy* of piercing the corporate veil where the corporate form is abused and the corporation acts as the alter ego of a controlling individual." *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1241 (D. Nev. 2008) (citing *LFC Mktg. Group, Inc. v. Loomis*, 8 P.3d 841, 845–46 (D. Nev. 2000) (emphasis added); *see also id.* ("Because Nevada law implicitly sanctions contractual alter ego liability and other courts specifically have applied it,

[debtor's] contractual liability could extend" to the non-debtor defendants as part of a breach of contract claim "if [the non-debtor defendants] are alter egos of [the signatory on the contract]."); *App-Ord. LLC v. Reynolds*, No. 2:24-cv-01480-GMN-DJA, 2025 WL 743749, at *3 n.3 (D. Nev. Mar. 7, 2025) (In Nevada, "[a]lter ego is not a standalone claim.") (citing N.R.S. 78.747); *NewRez LLC v. Haddad*, No. 2:23-cv-01839-JAD-DJA, 2024 WL 3605838, at *2 (D. Nev. July 30, 2024) (applying Nevada law and determining that, "[t]o the extent that 'alter ego' is pled as a separate claim for relief, I dismiss it and construe this 'count' instead as merely a separate theory of liability for any claim to which it can apply").[6]

Consideration of the equities also support the Court's conclusion for at least two reasons. First, Plaintiff and ICS stipulated to relief from the bankruptcy proceeding's automatic stay in order to "fully adjudicate the disputes between them" in the instant action. *In re iBridge Cloud Solutions, Inc.*, No. 24-11105-KHT, ECF No. 27 ¶ 7. Notably, the May 1, 2025 Bankruptcy Stipulation does not limit the types of claims that could be brought in this federal action, even though that stipulation was entered into *after* Plaintiff filed the operative amended complaint adding the alter ego claims against the Non-Debtor Defendants. *See id.* (dated May 1, 2025); ECF No. 22 (filed April 25, 2025). At that point, the Trustee knew, or should have known, that fully adjudicating this matter would involve resolving Plaintiff's contract claims, each of which invoke the alter ego liability. That the

---

[6] Courts in other jurisdictions also permit the same. *See, e.g.*, *Ahcom*, 623 F.3d at 1250 (determining that even though "California law does not recognize an alter ego claim or cause of action that will allow a corporation and its shareholders to be treated as alter egos for purposes of all the corporation's debts," an individual creditor could still recover under a theory of alter ego liability in connection its breach of contract claim).

stipulation fails to carve out adjudication of the alter ego remedy is significant. *See, e.g.*, *Lorenz*, 963 P.2d at 496 (because "the bankruptcy court's order lifting the stay was broad and not specifically limited to [a specific] issue," "the district court was authorized to reach the alter ego issue" and determine that if the third-parties were the "[debtor's] alter ego, then they would have been liable on the judgment[.]").

Second, although one purpose of creating a bankruptcy estate is to ensure that all creditors are treated fairly, *see Begier v. I.R.S.*, 496 U.S. 53, 54 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code[.]"), that consideration has less force here in light of the identity of the remaining debtors. Plaintiff alleges that other than Plaintiff, ICS's only other creditors are two of the Non-Debtor Defendants: ITS and Gold Tailings. ECF No. 22 ¶ 68. The Trustee's concern that allowing Plaintiff to pursue an alter ego remedy "would not benefit all creditors," ECF No. 79 at 7–8, is thus less compelling in light of the specific circumstances presented here and Plaintiff's allegations, which the Court accepts as true at this stage.

Accordingly, consistent with the foregoing, the Trustee's dismissal motion is granted, and Plaintiff's third, standalone claim for alter ego liability is dismissed. However, Plaintiff may still recover under the equitable remedy of alter ego liability in connection its two remaining claims.

### C.     Non-Debtor Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Personal Jurisdiction (ECF No. 56)

In addition to the Trustee's efforts to secure the Non-Debtor Defendants' dismissal, the Non-Debtor Defendants filed a separate dismissal motion under Rule 12(b)(2) and contend that Plaintiff failed to allege facts sufficient to establish general or specific

personal jurisdiction over the Non-Debtor Defendants, none of which are located in Colorado or have any minimum contacts with Colorado. *See* ECF No. 56 at 2–7. The Non-Debtor Defendants further contend that exercising personal jurisdiction over them in Colorado would violate the Due Process Clause because Plaintiff cannot establish that the Non-Debtor Defendants engaged in any purposeful direction of activities in Colorado. *Id.* at 7–8. In response, Plaintiff argues that the Non-Debtor Defendants are subject to specific personal jurisdiction in Colorado because, as alleged alter egos, ICS's consent to jurisdiction in Colorado and minimum contacts in Colorado are binding on the Non-Debtor Defendants.[7] ECF No. 71 at 11–15. The Non-Debtor Defendants' reply brief addresses Plaintiff's argument and further contends that because Plaintiff has failed to plead alter ego liability, it has not established personal jurisdiction over the Non-Debtor Defendants in Colorado. ECF No. 85 at 5–8.

As explained below, because Plaintiff has adequately pled the Non-Debtor Defendants' personal jurisdiction in Colorado by making a prima facie showing of alter ego liability, the dismissal motion is denied.

       1. *Rule 12(b)(2) Legal Standard*

A dismissal motion pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure may be granted if the court lacks personal jurisdiction over the defendant. "Although the plaintiff bears the burden of establishing personal jurisdiction over the defendant, at the preliminary stage of the litigation, this burden is 'light,'" *BASF Corp. v.*

---

[7] In its opposition, Plaintiff expressly "concede[d] that the [Non-Debtor] Defendants are not subject to *general* personal jurisdiction in Colorado" for purposes of this motion, ECF No. 71 at 13 n.3, and so the Court's analysis only considers whether Plaintiff has pled allegations sufficient to establish specific personal jurisdiction over the Non-Debtor Defendants.

*Willowood, LLC*, 359 F. Supp. 3d 1018, 1024–25 (D. Colo. 2019) (citing *Intercon, Inc. v. Bell Atl. Internet Sol., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000)), and Plaintiff need "only make a prima facie showing of personal jurisdiction" for its claims to survive. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007). This prima facie showing can be met "by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *Id.* (citation omitted). While the Court must accept as true the well-pled facts in Plaintiff's complaint, it will do so only if those facts are undisputed by the defendants' affidavits. *Id.* (citing *Wenz v. Memery Crystal,* 55 F.3d 1503, 1505 (10th Cir. 1995)). If the jurisdictional allegations are challenged by an appropriate pleading, Plaintiff must then "support [the] jurisdictional allegations in a complaint by competent proof of the supporting facts." *Pytlik v. Prof'l Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989); *see also BASF Corp.*, 359 F. Supp. 3d at 1024–25.

2. *Requirements to Exercise Personal Jurisdiction Over a Nonresident Defendant via Alter Ego Liability*

To establish personal jurisdiction over a nonresident defendant, a plaintiff must demonstrate both that jurisdiction is proper under the forum state's long-arm statute and that the exercise of personal jurisdiction comports with due process. *See Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1357 (10th Cir. 1990). Because Colorado's long-arm statute permits the Court to exercise personal jurisdiction to the full extent of the Due Process Clause, this analysis collapses into a single due process inquiry. *See* Colo. Rev. Stat. §§ 13-1-124(1)(a)–(b); *Dart Int'l, Inc. v. Interactive Target Sys., Inc.*, 877 F.Supp. 541, 543 (D. Colo. 1995) (citing *Safari Outfitters, Inc. v. Superior Court*, 167 Colo. 456, 448 P.2d 783 (1968)). A court may exercise specific personal jurisdiction over a defendant

consistent with the Due Process Clause if a plaintiff demonstrates that "(1) the defendant has purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state, and (2) the litigation results from alleged injuries that arise out of or relate to those activities." *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1160 (10th Cir. 2010) (quotations, internal quotation, and citations omitted). "Purposeful availment, however, does not mean the same thing with respect to all claims." *TransFirst*, 323 F.R.D. at 649.

In Colorado, personal jurisdiction may also "be exercised on a theory of alter ego" liability. *TransFirst*, 323 F.R.D. at 653 (citing *Griffith v. SSC Pueblo Belmont Operating Co. LLC*, 381 P.3d 308, 312 (Colo. 2016)); *see also F.D.I.C. v. First Interstate Bank of Denver, N.A.*, 937 F. Supp. 1461, 1467 (D. Colo. 1996) ("[I]f one corporation is the alter ego of another, a court may pierce the corporate veil and base its jurisdiction on one corporation's contacts with the forum state."). To establish personal jurisdiction over defendants at the preliminary stages of litigation, "the plaintiff bears the [light] burden of demonstrating a prima facie case" that alter ego liability applies based on the applicable state law. *BASF*, 359 F. Supp. 3d at 1026 (citing *First Horizon Merch. Servs., Inc. v. Wellspring Capital Mgmt., LLC*, 166 P.3d 166, 178 (Colo. App. 2007)); *see also TransFirst*, 323 F.R.D at 653 (citing *Griffith*, 381 at 312). The prima facie case can be established "on the basis of affidavits and other written material." *Id.* at 1025–26 (citing *Melea*, 511 F.3d at 1065). A court will then consider "whether it may pierce the corporate veil and impute the resident subsidiary's contacts to the nonresident parent company." *Griffith*, 381 P.3d at 310. If it does so, "the resident subsidiary's contacts may be imputed

to the nonresident parent company, the court shall analyze all of the nonresident company's contacts with Colorado—including the resident subsidiary's contacts—to determine whether exercising either general or specific personal jurisdiction over the company comports with due process." *Id.* at 310–11. "However, if the trial court concludes that it may not pierce the corporate veil, it shall treat each entity separately and analyze only the contacts that each parent company has with the state when performing the personal jurisdiction analysis." *Id.* at 311. As discussed above, because Colorado is the state with the most significant relationship to Plaintiff's underlying contract claims, the Court assesses whether Plaintiff has pled an alter ego theory under Colorado law.

In Colorado, "[a] court may pierce the corporate veil when '(1) the entity is merely the alter ego of the member, (2) the LLC form is used to perpetuate a wrong, and (3) disregarding the legal entity would achieve an equitable result." *TransFirst*, 323 F.R.D. at 653 (citing *Griffith*, 381 P.3d at 313 (quotation and citation omitted)). As the Tenth Circuit has recognized, "the Colorado Supreme Court prescribes a fact-intensive, eight-part analysis to determine 'whether such unity of interest exists as to disregard the corporate fiction and treat the corporation and shareholder[s] as alter egos.'" *In re Stone Pine Inv. Banking, LLC*, 2023 WL 8758947, at *17 (10th Cir. Dec. 19, 2023) (unpublished) (quoting *Connolly v. Englewood Post No. 322 Veterans of Foreign Wars of the U.S., Inc.*, 139 P.3d 639, 644 (Colo. 2006)). Those factors include:

> whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a 'mere shell,' (7) shareholders disregard legal

formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*El Paso Firemen & Policemen's Pension Fund v. InnovAge Holding Corp.*, 773 F. Supp. 3d 1236, 1246 (D. Colo. 2025) (citing *Connolly*, 139 P.3d at 644); *see also Stockdale v. Ellsworth*, 407 P.3d 571, 576–577 (Colo. 2017) (quotation, internal quotation, and citation omitted) (same); *TransFirst*, 323 F.R.D. at 653 (same).

### 3.  *Plaintiff's Alter Ego Allegations*

Plaintiff puts forth numerous allegations that the Non-Debtor Defendants' are ICS's alter egos. *First*, there was common ownership and control of ICS and the Non-Debtor Defendants via Defendant Paul Smitham, who was simultaneously an officer at and/or member of ICS, ICT, ITS, Gold Tailings, and DCFM. *See* ECF No. 22 ¶¶ 14, 18, 22, 24, 27.[8] *Second*, ICS, ICT, ITS and Gold Tailings operated out of the same primary business location: the Gold Tailings property, *id.* ¶¶ 15, 19, 25, 72, 73, and ICS, ICT, ITS never paid Gold Tailings for the use of its property, *id.* ¶ 75. *Third*, ICS, ICT, and Gold Tailings co-mingled funds, transferred money, and made loans between the businesses to pay off each other's debts. *See generally id.* ¶¶ 26–44, 49–53. *Fourth*, Defendant Smitham and his daughter (a non-party) were the only individuals involved in the loans made between all three entities, *id.* ¶ 49–50, which were entered into without "promissory notes or other

---

[8] The affidavit submitted by Defendant Smitham also confirms as much, at least with respect to his positions at ICT, ITS, and Gold Tailings. ECF No. 56-1 (Smitham Decl.) ¶¶ 7, 12, 17. Although Defendant Smitham's declaration, and the declaration submitted by DCFM CEO Allen McKibben, ECF No. 56-2, do not confirm Plaintiff's allegations with respect to Smitham's role at ICS and DCFM, they also do not refute them. According to his sworn statement, Mr. McKibben is DCFM's CEO and is currently the sole owner of 100% of DCFM stock. *Id.* ¶ 1. However, that is not inconsistent with Plaintiff's allegations that Defendant "Smitham *was* President of DCFM," ECF No. 22 ¶ 27 (emphasis added), and owned DCFM in 2022, *id.* ¶ 47 ("In 2022, [ICS] and DCFM (also owned by Smitham *at the time*) . . .") (emphasis added). And although Defendant Smitham's declaration does not indicate whether he was President of ICS, the Debtor Defendant, ICS's bankruptcy trustee, admitted to that allegation in its answer. *See* ECF No. 54 at 5, ¶ 14 and response.

documents evidenc[ing] the loans" and without any entity charging or paying interest to another, *id.* ¶ 51. *Fifth*, ICS entered into contracts with ICT and DCFM in 2022 where Defendant Smitham signed the contracts on behalf of all three parties. *Id.* ¶¶ 45–48. *Sixth*, Defendant Smitham referred to ICS, ICT, ITS, and Gold Tailings each as "partner companies," *id.* ¶ 54, and he used a single email domain to communicate on behalf of his work at ICS, ICT, and Gold Tailings, *id.* ¶¶ 60–63. *Seventh*, ICS was also not adequately capitalized, *id.* ¶ 9, and entered into contracts with Plaintiff that its tax returns demonstrate it was unable to pay, *id.* ¶¶ 69–71. Plaintiff contends that, based on these allegations, piercing the corporate veil is not only appropriate but "is necessary . . . to prevent injustice" because "ICS has gone to great lengths to avoid its contractual obligations to [Plaintiff]," including filing for bankruptcy two weeks after Plaintiff filed this lawsuit. ECF No. 71 at 10.

Although the Non-Debtor Defendants contend that a "a bankrupt entity's mere inability to pay its debts" should not be grounds for piercing the corporate veil, ECF No. 85 at 6, the argument loses its teeth when considering Plaintiff's allegation that ICS racked up $11 million in unpaid charges to Plaintiff, ECF No. 22 ¶ 91, despite ICS's gross sales being less than $250,000 in total between 2019, 2020 and 2022, *id.* ¶¶ 69–71. Viewing the allegations in the light most favorable to the Plaintiff, the Court concludes that Plaintiff has made a *prima facie* showing to meet many of the alter ego factors outlined by the Colorado Supreme Court.[9] *See, e.g.*, *El Paso Firemen*, 773 F. Supp. 3d at 1247–48; *First Interstate Bank of Denver*, 937 F. Supp. at 1467.

---

[9] Although a closer call with respect to Plaintiff's allegations as to ITS and DCFM, the Court is satisfied that Plaintiff has met his pleading burden with respect to these entities, as well.

4.  *Whether Due Process Permits the Exercise of Personal Jurisdiction*

Having decided that Plaintiff's alter ego claim may proceed, the Court must next determine whether ICS's "contacts may be imputed to the [Non-Debtor Defendants]," and "determine whether exercising . . . specific personal jurisdiction over the [nonresident, Non-Debtor Defendants] comports with due process." *Griffith*, 381 P.3d at 310–11. Because Plaintiff has conceded that general personal jurisdiction is not at-issue for purposes of this motion, ECF No. 71 at 13 n.3, the Court considers whether exercising specific personal jurisdiction over the Non-Debtor Defendants would violate their due process rights. The Non-Debtor Defendants contend that it would, ECF No. 56 at 7–8, and argue that subjecting them to personal jurisdiction in Colorado "would not comport with "fair play and substantial justice," *id.* at 7 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). In response, Plaintiff argues that because ICS agreed to the Colorado forum selection and choice of law clauses in the MCA and the Restructure Agreement, *see* ECF No. 22-2 (MCA) § 5.4; ECF No. 84-1 (Restructure Agreement) § 3.8,[10] subjecting the Non-Debtor Defendants, as alter egos of ICS, to those forum selection provisions does not offend due process. ECF No. 71 at 15. Plaintiff further argues that "there is nothing unreasonable about haling the [Non-Debtor] Defendants into Colorado to defend against Zayo's breach of contract claims that arise from a contractual

---

[10] The MCA provides: "The Agreement shall be governed by and construed in accordance with the laws of Colorado, without giving effect to any conflict of law principles. Venue for any dispute arising under the Agreement shall be Denver, Colorado." ECF No. 22-2 § 5.4.

The Restructure Agreement provides: "All claims arising out of or relating to this Agreement will be governed by Colorado law, excluding Colorado's conflict of laws rules, and will be litigated exclusively in the federal or state courts of Denver, Colorado. The Parties consent to the personal jurisdiction in those courts." ECF No. 84-1 § 3.8.

relationship initiated in *Colorado* by Mr. Smitham on ICS's behalf." *Id.* (citing *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1063 (10th Cir. 2008). The Court agrees with Plaintiff.

"A court 'may obtain personal jurisdiction over a defendant in three ways: consent by the parties, presence in the forum state, and actions by the defendant which affect people in the forum state.'" *Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 1:20-cv-02757-DDD-STV, 2020 WL 6119470, at *3 (D. Colo. Oct. 16, 2020) (citing *Qwest Communications Int'l, Inc. v. Thomas*, 52 F. Supp. 2d 1200, 1204 (D. Colo. 1999)). Personal jurisdiction is waivable and forfeitable, and "there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (citing *Compagnie*, 456 U.S. at 703), including by stipulating in advance to forum-selection provisions and agreeing "to submit their controversies for resolution within a particular jurisdiction," *id.* (citing *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311 (1964)).

As an initial matter, there appears to be no material dispute among the parties, and the Court agrees, that *ICS* (proceeding as the Trustee) is bound by the MCA and Restructure Agreement's forum selection and choice of law provisions, and that the enforcement of those provisions does not offend due process. *See* ECF No. 22-2 (MCA) § 5.4; ECF No. 84-1 (Restructure Agreement) § 3.8.[11] "Where such forum-selection

---

[11] The Non-Debtor Defendants' briefing references the fact that MCA attached to the complaint is "unsigned." See ECF No. 56 at 6 (referencing ECF No. 22-2); ECF No. 81 at 2, 4 (same). To the extent this is meant to suggest that the forum selection clause in the MCA is unenforceable or otherwise not binding on ICS, the Court is unpersuaded for two reasons. First, Plaintiff properly pleaded that Zayo and ICS

provisions have been obtained through 'freely negotiated' agreements and are not

'unreasonable and unjust,' their enforcement does not offend due process." *Id.* (citing *M/S*

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). However, the Non-Debtor

Defendants dispute that the forum selection clauses apply to them as non-signatories on

those agreements, ECF No. 85 at 8–10, and contend that exercising personal jurisdiction

over the Non-Debtor Defendants would offend their due process rights because they have

not purposefully availed themselves in Colorado, *id.* at 11. However, Plaintiff's argument

is a little different: namely, the Non-Debtor Defendants' due process rights are not violated

if personal jurisdiction is exercised over them *based on* their status as alter egos of ICS,

which voluntarily agreed to a forum selection clause. ECF No. 71 at 15 (citing *Fitness*

*Together Franchise, L.L.C.*, 2020 WL 6119470, at *3).

Although Plaintiff's argument is not well-fleshed out, the case law Plaintiff invokes

as support is compelling. In *Fitness Together Franchise*, the court considered whether a

forum-selection clause in a contract was enforceable against non-signatories under the

"closely-related" doctrine. 2020 WL 6119470, at *4. There, the court noted that "[s]everal

federal courts have adopted a 'closely related' doctrine in this context, whereby 'non-

signatories to a contract are subject to its valid forum selection clause if they, or the claims

they bring, are 'closely related to the contractual relationship'" at issue in the case. *Id.* at

*4 (citing *PFC Payment Sols., LLC v. Element Payment Servs., Inc.*, No. 12-cv-01472-

---

entered into the MCA, ECF No. ¶ 78, and that allegation is supported by the allegations pleaded in support
of the Debtor Defendant's counterclaims, ECF No. 54 at 49–50, ¶¶ 102–106. Second, the Restructure
Agreement, which was signed by Defendant Smitham on behalf of ICS and which Plaintiff also attached to
the complaint, contains its own forum selection and choice of law provision that is applicable here and
similar to the MCA's forum selection clause. ECF No. 2-4 at 6.

CMA-MJW, 2012 WL 3264305, at *3 (D. Colo. Aug. 10, 2012)). Acknowledging that the Tenth Circuit has not ruled on this issue, the *Fitness Together* court surveyed courts around the country and found that the closely-related doctrine has been "described as 'widely accepted,' and variations of the doctrine appear to remain good law in at least five circuits outside the Tenth Circuit." *Id.* (collecting cases); *see also OptumRx PBM of Illinois, Inc. v. Nat'l Benefit Builders, Inc.*, No. 23-cv-03020-NYW-NRN, 2025 WL 2636574, at *10 (D. Colo. Sept. 12, 2025) (collecting cases)); *see also LMMC, LLC v. Solberg*, No. 8:24CV348, 2025 WL 1364199, at *5 (D. Neb. May 12, 2025) ("The closely-related doctrine permits 'non-signatories to an agreement to be bound by, and to enforce, forum selection clauses where, under the circumstances, the non-signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound.'") (citing *Franlink Inc. v. BACE Servs., Inc.*, 50 F.4th 432, 439 (5th Cir. 2022)). The *Fitness Together* court further observed that "'[c]losely related' appears to be an umbrella term that refers to a variety of common law doctrines courts use to bind non-signatories to contracts, including third-party beneficiaries, successors-in-interest, principals of signatory agents, and **alter egos**." *Id.* at *5 (citing *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 339 (7th Cir. 2012) (emphasis added). Since *Fitness Together*, other courts in the District of Colorado have acknowledged the application of the closely-related doctrine when considering whether a forum-selection clause applies to non-significatory to a contract. *See, e.g.*, *Branches Co., LLC v. Wilkinson*, No. 23-cv-02576-GPG-STV, 2024 WL 3402710, at *3 (D. Colo. Apr. 30, 2024), *report and recommendation adopted*, No. 23-cv-02576-GPG-STV, 2024 WL 3402709 (D.

Colo. May 16, 2024) (acknowledging that "the 'closely-related' doctrine appears to apply specifically in the context of determining whether non-signatories to a contract are subject to that contract's forum-selection clause"); *cf. Motto Franchising, LLC v. UMortgage LLC*, No. 1:23-cv-00609-RM-SBP, 2024 WL 1509178, at *10-11 (D. Colo. Feb. 16, 2024), *report and recommendation adopted*, No. 23-cv-00609-RM-SBP, 2024 WL 1508824 (D. Colo. Mar. 6, 2024) (acknowledging the existence of the closely-related doctrine, but declining to apply it in a case concerning an "alleged tortious interferer").

While neither party explicitly addresses the closely-related doctrine in their briefing, the Court finds that Plaintiff's *prima facie* showing that the Non-Debtor Defendants are alter egos of ICS is also sufficient to establish that ICS and the Non-Debtor Defendants are closely-related such that they are also bound by the forum selection clauses in the MCA and Restructure Agreements. "If the non-party would be bound to the contract either as a successor or as an alter ego, he or she ordinarily would also be bound to the forum selection clause." *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, No. 25-CV-1260 (JAV), 2025 WL 2916153, at *8 (S.D.N.Y. Oct. 14, 2025) (citing *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20-CV-00967 (LJL), 2021 WL 918556, at *9 (S.D.N.Y. Mar. 10, 2021)); *see also NCR Corp. v. ATP TIC.BIL.ELK.GUC.KAY.URT.PA*, No. 1:21-CV-01385-VMC, 2023 WL 11959689, at *5 n.3 (N.D. Ga. Mar. 30, 2023) ("[A]n alter ego showing is a sufficient, but not necessary condition for enforcement of a forum selection clause against a non-party.").

Other courts have found that due process is not offended where the closely related doctrine is invoked to enforce a forum selection clause in the context of an alter ego

relationship. *See, e.g.*, *Seatig, Inc. v. BizLog, LLC*, No. 24-CV-7946 (JPO), 2025 WL 3101250, at *4 (S.D.N.Y. Nov. 6, 2025) (because of "due process requirement[s], 'a forum-selection clause does not give rise to personal jurisdiction over a non-signatory *unless* the non-signatory is 'otherwise bound to the agreement, as for example under the ordinary law of successor liability and *alter ego*.'") (citing *Koh v. Koo*, No. 22-CV-6639, 2023 WL 5352786, at *3 (S.D.N.Y. Aug. 21, 2023) (emphasis added)). Likewise, the Court sees no due process violation by doing the same here.

Accordingly, the Non-Debtor Defendants Motion to Dismiss for lack of jurisdiction is denied.

### D.  Plaintiff's Motion to Dismiss the Trustee's Amended Counterclaims (ECF No. 64)

In addition to Defendants' dismissal motions, Plaintiff also filed a motion seeking dismissal of the Trustee's amended counterclaims under Rule 12(b)(6). ECF No. 64.

The Trustee's counterclaims tell a very different story than the one advanced in Plaintiff's complaint. While Plaintiff contends that this case arises from ICS's failure to pay for the services Plaintiff provided pursuant to the parties' agreements, the Trustee contends that it was Plaintiff in the wrong. In essence, the Trustee alleges that Plaintiff fraudulently represented to ICS that it could "design, install, monitor, and manage" a "diverse and redundant [fiber] network" and "communication infrastructure" in order to obtain ICS's business. *See, e.g.*, ECF No. 54 at 32–33, ¶¶ 6, 9, 10. To recover on Plaintiff's alleged fraud and failure to deliver on its promises, the Trustee filed seven amended counterclaims for (1) breach of the various service agreements entered into pursuant to the MCA; (2) breach of the Restructure Agreement; (3) breach of the covenant

of good faith and fair dealing; (4) fraudulent misrepresentation; (5) fraudulent non-disclosures; (6) declaratory judgment; and (7) equitable subordination under 11. U.S.C. § 510(c). ECF No. 54 at 49–67.  Plaintiff filed a motion seeking to dismiss each of the amended counterclaims. ECF No. 64 at 2; *see also generally* ECF No. 88. The Trustee opposed nearly all of Plaintiff's requested relief, ECF No. 84, but agreed to withdraw its declaratory judgment claim, *id.* at ECF No. 84 at 3 n.1.[12]

With respect to the remaining claims, a key dispute is whether Plaintiff was required to design, install, monitor and manage a "redundant and diverse" network, within a specified timeframe, based on the terms of the parties' agreements and service orders. From Plaintiff's perspective, it was not, and as a result, the amended counterclaims should be dismissed. *See generally* ECF No. 64. The Trustee argues that such terms are in the parties' agreements, which incorporate the terms of customer orders promulgated thereunder, or else the contractual terms are ambiguous and, as a result, the counterclaims should not be dismissed at this stage. *See generally* ECF No. 84.

Upon consideration of the parties' arguments, Plaintiff's motion is granted in part and denied in part for the reasons explained below.

1.    *Rule 12(b)(6) Legal Standard*

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "The question is whether, if the allegations are true,

---

[12] As the parties are in agreement, the Trustee's declaratory judgment counterclaim is dismissed. However, because Plaintiff's motion refers to the amended counterclaims by number in its dismissal motion, the Court retains the original numbering of the counterclaims for purposes of this order.

it is plausible and not merely possible that plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009). "While courts must accept well-pleaded factual allegations as true, purely conclusory statements are not entitled to this presumption." *WildEarth Guardians v. Extraction Oil & Gas, Inc.*, 457 F. Supp. 3d 936, 945 (D. Colo. 2020).

    2.    *Counterclaims 1–2: Contract Claims*

    Plaintiff argues that the Trustee's first two counterclaims alleging contractual breaches (for breach of service agreements and breach of the Restructure Agreement) should be dismissed because, based on the clear and unambiguous language in the parties' agreements, Plaintiff did not breach any agreement or act in bad faith. ECF No. 64 at 5–9. In its response, the Trustee disagrees with Plaintiff's interpretation of the parties' agreements and contends that either its interpretation is correct, or the agreements are ambiguous. ECF No. 84 at 4–13.

    Under Colorado law, which governs the Parties' agreements pursuant to their choice of law provisions,[13] a breach of contract claim has four elements: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted). In Colorado, "[t]he primary goal of contract interpretation is to determine and give effect to the intent of the parties." *Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of*

---

[13] As discussed further above, the MCA and Restructure Agreement each contain a Colorado choice of law provision. *See* ECF No. 22-2 (MCA) § 5.4; ECF No. 84-1 (Restructure Agreement) § 3.8.

*Aviation*, 9 P.3d 373, 376 (Colo. 2000). The parties' intent is "determined from the contract language itself." *Union Rural Elec. Ass'n, Inc. v. Pub. Utilities Comm'n of State*, 661 P.2d 247, 251 (Colo. 1983). Contract interpretation "and the determination of whether a provision in the contract is ambiguous are questions of law." *McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1144 (10th Cir. 2023) (citing *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996)).

To determine whether a contract is ambiguous, the Court must examine the contractual language and "construe[ it] in harmony with the plain and generally accepted meaning of the words employed." *Id.* (citing *Ad Two, Inc.*, 9 P.3d at 376). A contract is ambiguous when it uses terms that "are susceptible to more than one reasonable interpretation." *Ad Two, Inc.*, 9 P.3d at 376. However, standing alone, "[t]he fact that the parties disagree as to [a term's] meaning does not in itself create an ambiguity." *Kuta v. Joint Dist. No. 50(J) of Cntys. of Delta, Gunnison, Mesa & Montrose*, 799 P.2d 379, 382 (Colo. 1990). "When an ambiguity is found to exist and cannot be resolved by reference to other contractual provisions, extrinsic evidence must be considered by the trial court in order to determine the mutual intent of the parties at the time of contracting." *McAuliffe*, 69 F.4th at 1144 (citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984)). But unless the Court determines that a contract is ambiguous, "it cannot be varied by extrinsic evidence." *Dorman*, 914 P.2d at 911; *see also McAuliffe*, 69 F.4th at 1144 ("Only after a contract is deemed ambiguous may the trial court use extrinsic evidence to assist it in ascertaining the intent of the parties." (citing *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993)).

### a.  *Counterclaim One: Breach of MCA and the Service Orders*

Turning to the first counterclaim, the MCA, which governs the parties' relationship, contains a clause which integrates other documents into the contract, including the terms of any service orders promulgated thereunder. *See* MCA § 1.1.[14] While the parties both allege that numerous customer orders were submitted under the MCA, *see, e.g.*, ECF No. 22 ¶¶ 78–79, ECF No. 54 at 59, ¶¶ 105-107, they dispute the substance of what those orders required. The Trustee contends that certain of these customer orders[15] were breached because Plaintiff failed to "properly deliver, configure, maintain, and monitor the services and products [ICS] purchased to ensure" that its networks and circuits were "diverse, redundant and operated properly to minimize the risk and length of hard outages," ECF No. 54 at 54, ¶ 120, as Plaintiff was required to do.

Plaintiff moves to dismiss counterclaim one because it contends that the Trustee's allegation that Plaintiff was required to deliver and monitor a "diverse and redundant" network reads terms into the MCA and service orders that are not there and that the parties did not agree upon. ECF No. 6 at 7. Plaintiff further notes that the MCA required

---

[14]  The MCA's integration clause provides: "This MCA, applicable Customer Schedules, applicable Supplemental Terms and Conditions, Customer Orders and any other attachments and/or addendums are hereby incorporated herein and shall collectively be referred to as the 'Agreement'." ECF No. 22-2 § 1.1. Accordingly, the Court finds that the service orders are incorporated by reference into the contract and, as a result, must be construed together with the other terms in the MCA. *See Veolia Water Techs., Inc. v. Antero Treatment LLC*, 564 P.3d 1089, 1101, *cert. granted in part*, No. 25SC21, 2025 WL 2506082 (Colo. Sept. 2, 2025) ("Whether contract terms have been incorporated by reference into a contract is also a question of law."); *Newflower Mkt., Inc. v. Cook*, 229 P.3d 1058, 1061 (Colo. App. 2010) (When an agreement spans multiple documents, the Court must "construe them together as a single instrument and give effect to all provisions.").

[15]  The Debtor Defendant refers to the service orders that Plaintiff is alleged to have breached as the iBridge Network Agreements, which includes "but [is] not limited to, service orders for the Long-Haul West Dark Fiber Circuit, the Sacramento Fiber Ring, the Lit Backup 100G Circuit, the Long-Haul East Dark Fiber Route, the lease of Infinera Equipment, Network Monitoring and the Lateral Supplement." ECF No. 54 at 49, ¶ 102.

ICS, as the customer, to provide to Plaintiff services orders that accurately described the services requested and detailed "any additional terms" to be applicable to those service orders. ECF No. 64 at 6. Plaintiff contends that despite this obligation being ICS's responsibility, ICS never ordered a "'diverse and redundant' network." *Id.* at 7. Plaintiff also argues that the reference to a network "ring" in a customer order should not be read as a request for a diverse network, as the Debtor Defendant alleges, ECF No. 54 at 50–53, ¶¶ 107–16, but should instead be understood as a request for a service that connects two fiber lines at multiple locations and with the lines entering and exiting those location "at different (or *diverse*) points," ECF No. 64 at 7. In response, the Trustee contends that the MCA and Customer Orders "expressly identify a diverse and redundant network," ECF No. 84 at 9, and it further disputes Plaintiff's proffered definition of "diverse and redundant," *id.* at 9–10. The Trustee urges the Court to either accept the Trustee's alternative definition of a "ring" network, *see id.* at 7–8, or determine that the contract is ambiguous, and its scope cannot be decided on a motion to dismiss, *id.* at 10.

The Court agrees with the Trustee that it is unable to fully understand all of the requirements in the Customer Orders at this stage and determine whether ICS ordered Zayo to provide it with a "diverse and redundant network." Accordingly, the Court declines to dismiss the first counterclaim at this stage. *See, e.g.*, *McAuliffe*, 69 F.4th at 1143. However, even if the customer orders are not ambiguous, it is clear the parties do not share a common understanding of what services were ordered. Moreover, the parties' briefing demonstrates that the customer orders integrated into the contracts contain terms that are "used in some special or technical sense not apparent from the contractual

document itself." *KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 776 (Colo. 1985)
(citing *Pepcol*, 687 P.2d at 1314). In such instances, it is appropriate for a court to "look
beyond the four corners of the agreement in order to determine the meaning intended by
the parties," *id.*, as it would when resolving a more traditional question of contract
ambiguity. At this stage, however, the Court does not have sufficient information to
determine which party is correct because resolving that question would require the Court
to consider extrinsic evidence, which is not appropriate at this stage. *See Pub. Serv. Co.
of Colorado v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006) ("To
decide whether a contract is ambiguous, a court may consider extrinsic evidence
regarding the meaning of the written terms, including evidence of local usage and of the
circumstances surrounding the making of the contract.") (citation omitted); *Teva Pharms.
USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015) ("[S]ometimes . . . when a written
instrument uses 'technical words or phrases not commonly understood,' those words may
give rise to a factual dispute. If so, extrinsic evidence may help to 'establish a usage of
trade or locality.'" (citing *Great Northern R. Co. v. Merchants Elevator Co.,* 259 U.S. 285,
291 (1922)).

Because resolving this discrepancy and determining whether Plaintiff failed to
deliver on its contractual obligations under the MCA and the service orders requires the
Court to consider extrinsic evidence, and because the Court is otherwise satisfied that
the Trustee has properly pled all elements of this breach of contract claim, Plaintiff's
motion to dismiss the first counterclaim for breach of contract is denied. *See, e.g., Carrio
Cabling Corp. v. Stryker Corp.*, No. 19-cv-01937-RM-KMT, 2020 WL 7130095, at *6 (D.

Colo. Apr. 2, 2020), *report and recommendation adopted*, No. 19-CV-01937-RM-KMT, 2020 WL 5887535 (D. Colo. Oct. 5, 2020) (denying a motion to dismiss for failure to state a claim where the contract at issue was "intrinsically ambiguous by its very design" and the court was "as yet without the ability to consider extrinsic evidence to ascertain the intent of the parties thereto"); *Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, No. 10-cv-02349-WJM-KMT, 2012 WL 84572, at *7 (D. Colo. Jan. 11, 2012) ("It is not appropriate for the Court to resolve this breach of contract claim at the pleading stage based on an alleged breach of such a general and ambiguous contractual provision." (citing *Test Servs., Inc. v. Princeton Review, Inc.,* No. 05–cv–01674, 2005 WL 3211594, at *5 (D.Colo. Nov. 29, 2005)).

       b. *Counterclaim Two: Breach of the Restructure Agreement*

The Trustee's second counterclaim focuses on Plaintiff's obligations under the Restructure Agreement and alleges that Plaintiff breached by failing to (1) deliver and install certain long-haul dark fiber routes and laterals within sixty 60 days, and (2) proactively monitor and manage the network. *See* ECF No. 54 at 55–56, ¶¶ 124–130.

With respect to counterclaim two, Plaintiff contends that the Trustee failed to state a claim and that Plaintiff did not breach because the Restructure Agreement does not contain the specified terms. ECF No. 64 at 8–9. Plaintiff also argues that the plain text of Section 2.7 of the Restructure Agreement required the customer (ICS), and not Plaintiff, to monitor the network. *Id.* at 8. In response, the Trustee argues that Plaintiff ignores the customer orders and MCA, which are incorporated by reference into the Restructure Agreement, and contends that (1) it has properly pleaded its claim, and (2) that Section

2.7 is a payment provision unrelated to the services ICS requested. *See* ECF No. 84 at 10–11. The Court agrees with the Trustee that counterclaim two survives, but concludes that only a portion of the counterclaim survives, as outlined below.

With respect to Plaintiff's alleged breach for failing to complete certain work within 60 days (specifically, "deliver[ing] and install[ing] long-haul dark fiber routes and laterals for the Long-Haul East Route within sixty (60) days," ECF No. 54 at 55 ¶ 127), the Court agrees with Plaintiff, *see* ECF No. 64 at 8, that the Trustee has failed to state a claim because it has not identified any contract provision containing that requirement. *See Satcom Sol. & Res. LLC v. Pope*, No. 19-cv-02104-CMA-GPG, 2020 WL 4511773, at *16 (D. Colo. Apr. 20, 2020), *report and recommendation adopted*, No. 19-cv-02104-CMA-NRN, 2020 WL 2188922 (D. Colo. May 6, 2020) ("A claim or counterclaim based on breach of contract must identify the specific contractual provision(s) allegedly breached." (citing *M & T Bank Corp. v. LaSalle Bank Nat. Ass'n*, 852 F. Supp. 2d 324, 334 (W.D.N.Y. 2012)). To the contrary, the Trustee's counterclaim allegations only establish that the 60-day deadline was discussed between the parties prior to entering into the Restructure Agreement, not that it was memorialized in the final contract. *See, e.g.*, ECF No. 54 at 42–43 ¶ 66 ("In early 2021, Zayo employees . . . convinced [ICS] to enter into a settlement agreement . . . by falsely representing that future long-haul dark fiber routes and laterals would be delivered within sixty (60) days."); *see also id.* at 45–46 ¶¶ 81, 83.

This is significant in light of the Restructure Agreement's integration clause, wherein the parties agreed that "this Agreement shall take precedence of any and all prior agreements, arrangements or understandings, written or oral, between any of the parties

relating to the subject matter of this Agreement." ECF No. 84-1 § 3.11. It is equally significant that the only document to which Trustee cites to establish Plaintiff's 60-day performance obligation is a "deficiencies document" prepared by ICS prior to executing the Restructure Agreement. *See* ECF No. 84 at 12 (citing ECF No. 84-1 (Exhibit 1)); ECF No. 54 at 46–47 ¶¶ 87–88. But as noted above, the Court may not take judicial notice of the deficiencies document at this stage because, unlike the service orders and other documents specifically incorporated into the Restructure Agreement, *see* ECF No. 84-1 § 3.11,[16] there is no indication that the deficiencies document is incorporated therein, and the Trustee does not argue otherwise. In light of this, the allegation that Plaintiff breached a 60-day deadline in the Restructure Agreement is insufficient to sustain counterclaim two. *See, e.g.*, *Satcom Sol. & Res.*, 2020 WL 4511773, at *16.

Regarding Plaintiff's alleged failure to uphold its network monitoring obligations, however, the Court finds that the Trustee has sufficiently pleaded a breach of the Restructure Agreement. With respect to this breach, the Trustee alleges that ICS signed a service order (that was incorporated into the Restructure Agreement, *see* ECF No. 84-1 § 3.11) that provides for "network monitoring" and required Zayo to "monitor [ICS's] network and inform [ICS] if there was a problem with the Long-Haul West Dark Fiber Circuit and/or the Sacramento Fiber Ring." ECF No. 54 at 36, ¶ 24; *see also* ECF No. 84

---

[16] Section 3.11 of the Restructure Agreement provides: "<u>Entire Agreement</u>. This Agreement, the MCA, and the applicable Customer Schedule(s), the LH Service Order, the Metro Service Order, and the 50-Lateral Supplement constitute the entire agreement between the parties and where in conflict, this Agreement shall take precedence of any and all prior agreements, arrangements or understandings, written or oral, between any of the parties relating to the subject matter of this Agreement." ECF No. 84-1. Because the Restructure Agreement incorporates multiple documents, some of which appear to be before the Court now, the Court construes those documents as part of the Restructure Agreement. *See, e.g.*, *Newflower*, 229 P.3d at 1061.

at 11 (referencing Order No. 1478560, which lists a "Service Item" of "Network Monitoring/NCC-MRC" (citing ECF No. 84-4 (Exhibit D) at 2)). The Trustee also specifies that this service was to include, e.g., monitoring Plaintiff's network facilities and electronics, performing maintenance to support customers and prevent outages, and proactively identifying network faults. *Id.* at ¶ 25. Plaintiff's argument that the identified service order does not include the seven specific categories of "network monitoring" identified in the Debtor Defendant's response does not negate the fact that the Trustee has clearly pled and identified "network monitoring" as a service that ICS ordered from Plaintiff. *See* ECF No. 84-4 at 2.

Accordingly, the Court finds that the Trustee has sufficiently plead counterclaim two with respect to Plaintiff's alleged failure to meet its network monitoring obligation. However, the Trustee has not sufficiently alleged that Plaintiff breached the Restructure Agreement by failing to meet the 60-day service deadline.

3.    *Counterclaim Three: Breach of Duty of Good Faith and Fair Dealing*

In support of counterclaim three, the Trustee alleges that both the MCA and Restructure Agreement contain an implied covenant of good faith and fair dealing and claims that Plaintiff breached that duty by (1) failing to "design, install, monitor, and manage a diverse and redundant network to prevent and minimize network outages" and (2) "bill[ing] ICS for services before infrastructure was installed or the service activated." ECF No. 54 at 56 ¶¶ 132, 134. The Trustee further alleges that "Zayo had discretion in how to monitor and manage a diverse and redundant network to prevent and minimize network outages." *Id.* at 57 ¶ 134.

Plaintiff contends that counterclaim three should be dismissed because (1) the contracts did not require Zayo to provide the specified services; (2) nothing in the contracts provided Zayo with discretion to perform; and (3) the Trustee fails to identify any instance where Zayo billed ICS for services before they were complete. ECF No. 64 at 10. In its opposition, the Trustee argues that "Zayo had discretion in how to design, install, monitor and manage to optimize and deliver peak performance" and that it abused that discretion. ECF No. 84 at 12 (citing ECF No. 54 (amended counterclaims) at 32–33, 56–57 ¶¶ 9, 134). The Trustee also contends that it has properly pleaded instances where "Zayo charged for services never performed or before it installed the requisite infrastructure/ or activated services, and continued to do so even after [ICS] objected." *Id.* at 13 (citing ECF No. 54 at 13 ¶ 134).

While "every contract contains an implied duty of good faith and fair dealing" in Colorado, this "covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Univ. of Denver v. Doe*, 547 P.3d 1129, 1140 (Colo. 2024) (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)). Moreover, this duty cannot be used to "contradict terms or conditions for which a party has bargained" or to "inject substantive terms into the parties' contract." *Max Fire Apparatus, Inc. v. Rosenbauer Am., LLC*, 759 F. Supp. 3d 1168, 1183 (D. Colo. 2024), *cert. denied*, No. 23-cv-01867-NYW-CYC, 2025 WL 676264 (D. Colo. Mar. 3, 2025) (citing *Miller v. Bank of N.Y. Mellon*, 379 P.3d 342, 348 (Colo. App. 2016)).

With respect to the alleged improper billing practices, the Court agrees with Plaintiff that the Trustee has failed to plead its claim. The single allegation that the Trustee

identifies in support of this alleged breach states that "Zayo billed [ICS] for services before infrastructure was installed or the service activated. Zayo's practice contradicted the reasonable expectations of the parties." ECF No. 54 at 13 ¶ 134; *see also* ECF No. 84 at 13 (citing same).[17] This threadbare and borderline conclusory allegation does identify any specific instance when such overbilling occurred or any contractual provision in the parties' agreements which gave rise to ICS's expectations, let alone one that conferred discretion on Zayo about how to implement its billing practices. *See Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based.") (citation omitted).[18] Moreover, other counterclaim allegations establish that ICS's billing expectations were based on "Zayo's representations in its Customer Handbook," and not a provision of the MCA or Restructure Agreement. ECF No. 54 at 39 ¶ 44. Because the duty of good faith and fair dealing only "'applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time," *Amato v. Mesa Lab'ys, Inc.*, No. 14-cv-03228-REB-KMT, 2015 WL 5321446, at *4 (D. Colo. Sept. 14, 2015) (citing *Amoco Oil*, 908 P.2d at 498), allegations grounded in the parties' expectations based on Zayo's customer handbook cannot support counterclaim three.

The allegation that Plaintiff breached its duty by failing to "design, install, monitor, and manage a diverse and redundant network to prevent and minimize network outages,"

---

[17] The Trustee also, once again, points to the "deficiencies document" as support for this claim, but as previously discussed, the Court may not consider that document at this stage.

[18] The Court also notes that the service orders and the Restructure Agreement each provided that Plaintiff was to issue monthly charges to [ICS] for the services ordered. *See* ECF No. 22-3 (service orders); ECF No. 84-1 (Restructure Agreement) § .

ECF No. 54 at 56 ¶¶ 132, 134, fails for similar reasons. As noted above, at least one service order incorporated into the parties' agreements references network monitoring. However, the counterclaim allegations do not identify a "specific contract term" which demonstrates that the parties' intent, at the time of contracting, was to confer onto Zayo discretionary authority to execute this task. *DC Auto., Inc. v. Kia Motors Am., Inc.*, 411 F. Supp. 3d 1137, 1149 (D. Colo. 2019) (citing *Amoco Oil*, 908 P.2d at 498–99). And in fact, Plaintiff identifies a provision of the MCA that appears to contradict this allegation, as it vests discretion in ICS to specify the services for which it was contracting. *See* ECF No. 64 at 13 (citing 22-2 (MCA) § 1.2).[19] Where, as here, the pleadings fail to identify "a specific contract term which allows for discretion in performance by," a claim for breach of the implied duty of good faith and fair dealing "fails as a matter of law." *Haynes for & on behalf of Unger v. Transamerica Corp.*, No. 16-cv-02934-KLM, 2018 WL 6046430, at *5 (D. Colo. Nov. 19, 2018) (citing *Kaspryzk v. PNC Bank, Nat. Ass'n*, No. 13-CV-00247-RBJ-KMT, 2013 WL 3895069, at *2 (D. Colo. July 29, 2013) (claim for breach of the implied duty of good faith and fair dealing failed because plaintiff "failed to identify a relevant discretionary term regarding the performance of her contract"). Consistent with the foregoing, the Trustee's third counterclaim for breach of implied duty of good faith and fair dealing is dismissed.

---

[19] In relevant part, section 1.2 of the MCA provides:

> Customer may request that Zayo provide Access and/or Services by submitting a customer order in a form provided by Zayo ("Customer Order"). Customer is responsible for the accuracy of all information that it provides to Zayo. Each accepted Customer Order shall be subject to the Agreement. Customer Orders shall set forth the term, pricing, Access and Service type and location(s), monthly recurring charge ("MRC"), non-recurring charge ("NRC") and any additional terms applicable to the Access and/or Services.

4.    *Counterclaims Four and Five: Fraudulent Misrepresentation & Fraudulent Non-Disclosure*

Plaintiff further argues for the dismissal of the Trustee's claims for fraudulent misrepresentation and fraudulent non-disclosure (counterclaims four and five, respectively). Plaintiff alleges that the fraud claims fail for four reasons: (1) the fraud claims are predicated on the same allegations as Plaintiff's alleged contractual breaches, ECF No. 64 at 11; (2) Plaintiff had no duty to disclose, *id.* at 12; (3) the integration clauses in the parties' agreements demonstrate that ICS could not justifiably rely on any statements made by Zayo prior to contracting, *id.* at 12–14; and (4) the Trustee has failed to plead causation with particularity as required under Federal Rule of Civil Procedure 9(b), *id.* at 14. The Trustee raises a defense to each of Plaintiff's arguments, ECF No. 84 at 14–15, but as explained below, only counterclaim four survives.

As both claims sound in fraud, the Trustee's counterclaim allegations "*must state with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Under Colorado law, a claim for fraudulent misrepresentation has five elements that must be pled accordingly: "(1) the defendant made a false representation of a material fact, (2) the one making the representation knew it was false, (3) the person to whom the representation was made was ignorant of the falsity, (4) the representation was made with the intention that it be acted upon, and (5) the reliance resulted in damage to the plaintiff." *Brightspot Sols., LLC v. A+ Prods., Inc.*, No. 20-cv-03335-MEH, 2021 WL 1251512, at *6 (D. Colo. Apr. 5, 2021) (citing *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013)). "[A] false representation of a past or present fact is any words or conduct which create[s] an untrue or misleading impression of the actual past

or present fact in the mind of another." *Russell v. First Am. Mortgage Co.,* 565 P.2d 972, 975 (Colo. App. 1977) (citation omitted). "In addition to an affirmative misrepresentation, 'a false representation may be the failure to disclose a material fact which in good conscience should have been disclosed.'" *Bristol Head Elec. Site Techs., LLC v. Aero Mktg. & Logistics, LLC*, No. 22CA1540, 2024 WL 3791821, at *9 (Colo. App. Feb. 15, 2024), *cert. denied*, No. 24SC211, 2025 WL 764616 (Colo. Mar. 10, 2025) (citing *Schnell v. Gustafson*, 638 P.2d 850, 852 (Colo. App. 1981)). "A promise concerning a future act, when coupled with a present intention not to fulfill the promise, can be a misrepresentation which is actionable as fraud." *Nelson v. Gas Rsch. Inst.*, 121 P.3d 340, 343 (Colo. App. 2005) (citing *Stalos v. Booras*, 528 P.2d 254, 256 (Colo. App. 1974)). However, "[s]uch promises are actionable only where there is proof that the defendant had the present intention not to fulfill the promise." *Id.* (citation omitted).

In response to Plaintiff's first argument that the fraud claims improperly arise from the same facts as the breach claims, the Trustee argues that Plaintiff "misapprehends the basis of the fraud claim," which arise from "misrepresentations of material facts [Zayo made] *pre-contract* that induced [ICS] to enter into various contracts and sign service orders. ECF No. 84 at 14 (citing ECF No. 54 at 57 ¶ 138). As Plaintiff correctly notes, this argument does not address or dispute Plaintiff's fundamental point. ECF No. 88 at 7–8. And the Trustee's sole argument does not address its other allegations regarding Zayo's alleged misrepresentations made after the contracts were executed, *see* ECF No. 54 at 57–60 ¶¶ 139–144. Plaintiff is correct that these representations, made after the parties entered into the MCA, are "predicated upon the mere non-performance of a promise or

contractual obligation, or upon failure to fulfill an agreement to do something at a future time." ECF No. 64 at 11 (citing *Brightspot Sols*, 2021 WL 1251512, at *7). That failure cannot support a claim for fraudulent misrepresentation, which "requires more than the mere nonperformance of a promise or the failure to fulfill an agreement to do something at a future time." *Nelson*, 121 P.3d at 343 (citation omitted). Moreover, by failing to address Plaintiff's argument regarding its alleged post-contractual misrepresentations, the Trustee's opposition is waived. *See, e.g.*, *Schone v. Sodexo, Inc.*, No. 1:19-cv-02283-SKC, 2021 WL 915937, at *3 (D. Colo. Mar. 10, 2021) ("[C]laims are deemed abandoned and subject to dismissal" when a party fails to respond to an argument in a dismissal motion.) (quotation omitted). Accordingly, the Trustee's allegations regarding Plaintiff's alleged failure to live up to its contractual obligations cannot support its fraud claim. *See Nelson*, 121 P.3d at 343.

The Trustee is correct, however, that Plaintiff's alleged pre-contractual misrepresentations can support its fraud claim. "[A] party's 'misrepresentation of material facts prior to the execution of an agreement may provide the basis for an independent tort claim," including a fraudulent misrepresentation claim. *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1169 (D. Colo. 2018) (citation omitted)). The Court further agrees with the Trustee that the integration clauses in the MCA and Restructure Agreement do not doom its claim because "[u]nder Colorado law, general integration clauses do not bar claims based on misrepresentations related to contracts" where the clause is "generic and does not specifically preclude misrepresentation claims." *Id.* at 1171–72 (citing *Keller Keller v. A.O. Smith Harvestore Prod., Inc.*, 819 P.2d 69, 73 (Colo.

1991)).[20] Because the contracts' general integration clauses do not specifically bar the Trustee's fraud claim based on Plaintiff's alleged pre-contractual misrepresentations, the Trustee has adequately pled justifiable reliance on Zayo's alleged misrepresentations, and counterclaim four may proceed, as limited by this order.[21]

However, the same is not true for the Trustee's fifth counterclaim for fraudulent non-disclosure. To plead a claim for fraudulent non-disclosure, the allegations, if taken as true, must establish: (1) "concealment of a material existing fact that in equity or good conscience should be disclosed;" (2) "knowledge that the fact is being concealed;" (3) "ignorance of the fact" by the defrauded party; (4) "intent that the [defrauded party] act on the concealed fact"; and (5) that the concealment resulted in damages. *Sussman v. Stoner*, 143 F. Supp. 2d 1232, 1239 (D. Colo. 2001) (citing *Burman v. Richmond Homes Ltd.,* 821 P.2d 913, 918 (Colo. Ct. App. 1991)). "To succeed on a claim for fraudulent concealment or non-disclosure, a [pleading party] must show that the [counter-party] had a duty to disclose material information." *Id.* (citing *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.,* 965 P.2d 105, 111 (Colo. 1998)). In Colorado, "[a party] has a duty to disclose to [another party] with whom he or she deals material facts that 'in equity or good

---

[20] The MCA's integration clause states that the contract "constitutes the entire and final agreement and understanding between the Parties, expressed or implied, with respect to the Access and Services and supersedes all other prior or contemporaneous representations, understandings or agreements." ECF No. 22-2 § 5.9. The Restructure Agreement contains similar language. *See* ECF No. 22-4 § 3.10 ("Each of the signatories to this Agreement hereby warrants that, in executing this Agreement, it does not rely upon any inducements, promises, or representations whatsoever made by any of the other parties herein, except to the extent stated in this Agreement and only to the extent stated on this Agreement.").

[21] Plaintiff's argument that the Debtor Defendant's allegations do not meet Rule 9(b)'s particularity requirements, made in its reply brief, ECF No. 88 at 7–8, does not change the Court's opinion. The allegations regarding Plaintiff's alleged pre-contractual misrepresentations are sufficiently specific for the Court to determine the "who, what, when, where, and how of the alleged fraud" as required under Rule 9(b). *Cf. Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1114 (D. Colo. 2010)

conscience' should be disclosed." *Mallon*, 965 P.2d at 111 (citation omitted). "Whether such duty exists is a question of law." *Vickery v. Evelyn V. Trumble Living Tr.*, 277 P.3d 864, 871 (Colo. App. 2011) (citing *Poly Trucking, Inc. v. Concentra Health Servs.*, Inc., 93 P.3d 561, 564 (Colo. App. 2004)).

The Court agrees with Plaintiff that the Trustee fails to establish that Zayo had any such duty here. The Trustee's entire response to Plaintiff's efforts to dismiss counterclaim five states: "Zayo also says that it had no duty to disclose. It did have that duty. Zayo concealed its inability to deliver on a deadline: 'Zayo concealed that it did not have the skills and capabilities required to design, install, monitor, and manage [ICS's] network and could not deliver the circuit by the deadlines promised.'" ECF No. 84 at 14. But this statement does not establish that Plaintiff had a duty to disclose, simply because the Trustee says so. And the allegations cited in support by the Trustee, *see id.* (citing ECF No. 54 at 60–61 ¶ 151),[22] without any support or factual enhancement, are equally unhelpful. *See Clinton*, 63 F.4th at 1275 ("An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement.") (citing *Brooks* v. *Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)).

The Trustee's general statement a "party has [a] common law duty to not engage in pre-contractual fraud or make material representation[s]," ECF No. 84 at 14 (citing *Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 506 P.3d 108, 121 (Colo. App. 2021)), while accurate, "provides absolutely no [] discussion" of how the specific

---

[22] The additional counterclaim allegations Plaintiff identifies are similarly conclusory. *See* ECF No. 64 at 12 (citing ECF No. 54 at 61 ¶ 152).

circumstances of this case, as alleged, give rise to that duty, *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009). The Trustee "must do more than identify an issue; they must explain why it has merit." *Id.* (citing *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1175 (10th Cir. 2002) ("We do not consider merely including an issue within a list to be adequate briefing.")).

Because the Trustee's "brief [] does not adequately present for review a contention that [Zayo] had a duty to disclose" under Colorado law, *id.*, counterclaim five for fraudulent non-disclosure must be dismissed.

     5.    *Counterclaim Seven: Equitable Subordination Under 11 U.S.C. § 510(c)*

Finally, Plaintiff argues that the seventh counterclaim for equitable subordination fails because the Trustee "fails to plead Zayo engaged in fraudulent and/or inequitable conduct" and "provides no facts whatsoever identifying any 'other creditors' or how they have been injured by Zayo's alleged inequitable conduct." ECF No. 64 at 15. In response, the Trustee contends it has adequately pled equitable subordination and urges against dismissal because "[i]n the absence of subordination, other creditors would be harmed because the amount of Zayo's claim is so overstated that were Zayo to recover (for example, under its alter ego claims), other creditors may recover nothing, rewarding Zayo's bad faith conduct." ECF No. 84 at 15–16.

Under 11 U.S.C. § 510(c) of the Bankruptcy Code, a party seeking equitable subordination must establish: (1) the claimant has engaged in inequitable conduct, (2) the claimant has injured other creditors or given unfair advantage to itself, and (3) subordination is not inconsistent with the Bankruptcy Code. *See In re Castletons, Inc.*,

990 F.2d 551, 559 (10th Cir. 1993) (citation omitted). Courts "place 'special emphasis' on whether inequitable conduct has occurred and recognize three categories of such conduct: '(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1154–55 (10th Cir. 2015) (citing *In re Hedged–Investments Assocs.*, Inc., 380 F.3d 1292, 1301 (10th Cir. 2004). However, equitable subordination is "an extraordinary remedy" that courts should use "sparingly." *Id.* at 1154 (citation omitted).

As discussed above, the Court is satisfied that, at this stage, the Trustee has alleged inequitable conduct with respect to Plaintiff's pre-contractual representations. However, the Trustee fails to explain how Plaintiff's alleged pre-contractual fraud either injured other creditors or gave Plaintiff an unfair advantage. Instead, the Trustee simply asserts that "[a]lthough Zayo repeatedly breached, it now seeks to recover more than $11,000,000 from [ICS] (although [ICS] has no assets). The Trustee assessed Zayo's claim and deems it to be asserted in bad faith and a continuation of Zayo's fraudulent conduct." ECF No. 84 at 15; *see also* ECF No. 54 at 66 ¶ 182 (alleging the same). But the Court has already made a preliminary assessment of Plaintiff's claims and found that, at this stage, they are sufficiently pleaded and may proceed. The Court is not convinced that Plaintiff acted "in bad faith" as "a continuation of its fraudulent conduct," as the Trustee contends. ECF No. 84 at 14. This conclusory and vague statement to the contrary is insufficient to support the equitable subordination counterclaim. *See In re Schuette*, No. 02-03376-R, 2008 WL 77767, at *3 (Bankr. N.D. Okla. Jan. 4, 2008) (dismissing equitable subordination claim because based on insufficient conclusory allegation that the

"[creditor] 'has engaged in inequitable . . . which will result in an unfair advantage for [creditor] resulting from its conduct"). Accordingly, counterclaim seven is dismissed.

### III.     CONCLUSION

Consistent with the foregoing, the Court hereby ORDERS the following:

- The Trustee's Motion to Dismiss Plaintiff's Third Claim for Relief (Alter Ego Liability) Pursuant to Rule 12(b)(1), ECF No. 55, is GRANTED. However, as discussed above, this only impacts Plaintiff's third, standalone claim for alter ego liability. Plaintiff may continue to pursue the equitable remedy of alter ego liability in connection with its two remaining claims for breach of contract and moneys owed on an open account.

- The Non-Debtor Defendants' Motion to Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P 12(b)(2), ECF No. 56, is DENIED.

- Plaintiff/Counterclaim Defendant Zayo Group, LLC's Motion to Dismiss Amended Counterclaims Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, ECF No. 64, is GRANTED in part and DENIED in part. Specifically, the Court orders that the motion is:

    o DENIED with respect to Counterclaim one;

    o GRANTED in part and DENIED in part with respect to Counterclaims two and four, which survive in part as set forth in this Order; and

    o GRANTED with respect to Counterclaims three, five, six, and seven, which are dismissed without prejudice.

DATED this 9th day of March 2026.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge